UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE : | CASE NO. 06-10179 |
| OCA, INC., et al. | SECTION "B" |
| DEBTORS | CHAPTER 11 |
| | Jointly Administered |

OCA, INC. AND OCA OUTSOURCE, INC.

    PLAINTIFFS

VERSUS                                                                                                                ADV.P. NO. 06-1220

ANGELA GOODMAN, D.D.S.

    DEFENDANT

## MEMORANDUM OPINION

This matter came on for hearing on October 23-24, 2007 on the complaint of OCA, Inc. and Outsource, Inc. (collectively, "Outsource" or "OCAO") against Angela Goodman, D.D.S. ("Goodman" or "Doctor") to collect certain moneys advanced pursuant to an agreement and two promissory notes. For the reasons set forth below, the court finds that Outsource is entitled to repayment of the sums advanced under the two notes as well as certain sums loaned under the agreement.

**I.      Background Facts**

Goodman is a dentist licensed to practice in Texas. She purchased a dental practice in Live Oaks, Texas in August 2003. Outsource is a company that provides office management support services to dental practices such as Goodman's. Outsource had no connection with either the purchase of Goodman's practice or the financing of it. The practice was experiencing

financial difficulties prior to Goodman's purchase, and Goodman had undertaken a significant amount of personal debt for her educational loans and the purchase of the practice. During the summer of 2004, Goodman contacted Outsource to discuss affiliation options.

Outsource and Goodman entered into an Outsource Service Agreement ( the "Outsource Agreement") on November 2, 2004 under which Outsource would provide non-clinical business services to Goodman for a monthly service fee of $2,500.[1] The Outsource Agreement included a promissory note offering a line of credit up to $50,000.[2] Under the Outsource Agreement, Outsource paid Goodman's salary, costs and expenses including her monthly rent, clinical supplies, and payroll. The Outsource Agreement also required Goodman to deposit payments received from patients into a joint account from which Outsource made the payments to Goodman's creditors. The parties operated under the Outsource Agreement beginning in January 2005, and Outsource advanced money to Goodman to pay her practice's expenses both under the line of credit promissory note and under the Outsource Agreement. Additionally, in July 2005, Goodman signed a second promissory note in the amount of $5,000 for money

---

[1] No service fee was charged for the first four months of the Outsource Agreement. This Outsource Agreement is a different type of arrangement from the Business Service Agreements (BSAs) that OCA, Inc. ("OCA") has used in almost every state. Those BSAs are contracts between OCA and affiliated orthodontists wherein OCA contacted to provide financing to aid the orthodontists in establishing a practice as well as providing various support services to the practice. In return, OCA received a substantial percentage of the orthodontist's net income over a number of years. Some of these BSAs have been held to be illegal by a federal district court sitting in Texas. *See Penny v. Orthoalliance, Inc.*, 2004 WL 877373 (N.D. Tex. 2004); *Penny v. Orthoalliance, Inc.*, 255 F. Supp. 2d 579 (N.D. Tex. 2003). This court has also held that the BSAs are illegal under Texas law in several adversary proceedings related to the main bankruptcy case. *See, e.g.,* (P-22) in *OCA, Inc., et al. v. Hodgkins, et al.*, Case No. 06-1167 in this court. The form of the Outsource Agreement between Goodman and Outsource has not been held illegal and should not be confused with the BSAs entered into by OCA.

[2] Exhibit 1.

2

Outsource loaned her so that she could buy an X-ray processor.

Although the details and chronology were not made clear to the court, it appears from the testimony of the witnesses and the exhibits, that sometime in August 2005, Outsource ceased paying Goodman's expenses, and Goodman stopped making deposits into the joint account. The parties mutually agreed to terminate their relationship and the Outsource Agreement as of September 1, 2005.[3]

On March 14, 2006 OCA and several of its affiliates filed Chapter 11 petitions for relief, and shortly thereafter, a complaint was filed by OCA and its affiliate, Outsource, initiating this adversary proceeding against Goodman. The complaint sought to recover the money advanced to Goodman under the Outsource Agreement, the $50,000 line of credit promissory note and the $5,000 promissory note for the purchase of the X-ray processor. Goodman filed an answer and a counterclaim seeking to have the complaint dismissed, alleging the Outsource Agreement was illegal under Texas law, claiming breach of contract, and asserting various other causes of action.

## II. Law and Analysis

### A. The promissory notes

Under Texas law, to collect on a promissory note a holder or payee must establish that 1) there is a note, 2) he is the legal owner and holder of the note, 3) the defendant is the maker of the note, and 4) a certain balance is due and owing on the note.[4] Once a holder establishes these

---

[3] Trial transcript of October 23, 2007 at p. 10; Trial transcript of October 24, 2007 at p. 37.

[4] *UMLIC VP, LLC v. T&M Sales and Environmental Systems, Inc.,* 176 S.W.3d 595, 611 (Tex.App.-Corpus Christi, 2005); *Blankenship v. Robins,* 899 S.W.2d 236 (Tex.App.-Houston [14th Dist.] 1994).

3

facts, he is entitled to recover unless the maker of the note establishes a defense.[5] At trial, Outsource met its burden of establishing it is the owner and holder of the $50,000 note, and that as of March 31, 2005 the principal balance remaining on that note was $49, 416.17. Goodman does not dispute her signature on the $50,000 note. Goodman has not established a valid defense to this note, and the court finds she is liable for the amount still owed on that note. Outsource has also established the elements necessary to prove the $5,000 note, and Goodman does not dispute that she is liable for the amount of that note. Both notes provide for interest. The $50,000 line of credit note calls for interest at 8.5% as set forth in § 1 of the note. At trial, Outsource's representative Cathy Green testified that she had computed the interest on the note as being $2,131.07 from the date borrowed until December 31, 2005, and $5,154.06 from December 31, 2005 to the date she testified at the trial, which was October 23, 2007.[6] The court awards these amounts in interest on the line of credit note plus interest at the rate set forth in the note from October 24, 2007 until paid. Cathy Green also testified that the interest on the $5,000 note for the purchase of the X-ray processor from August 1, 2005 through October 23, 2007 is $511.40.[7] The court awards this amount plus interest at the 8.5% interest rate set forth in the note itself from October 24, 2007 until paid.

---

[5] *UMLIC v. T&M Sales,* 176 S.W.3d at 611.

[6] Trial transcript of October 23, 2007 at pp. 68-70. Green testified that she was uncertain as to the proper interest rate on the line of credit note, and that in making her calculations, she used the amount that had been calculated by Outsource's software program and used that as a basis for her calculations. *See* exhibit 16. The court's calculations show this to be less than the 8.5% called for by the note, but because Green testified that this was the amount owed, the court will award that amount for the time period before the trial.

[7] Trial transcript of October 23, 2007 at p. 69. This amount is also less than the court's calculations at the 8.5% rate in the note. The court allows this amount through the date of the trial.

Goodman maintains as her primary defense that her liability on the $50,000 note is limited to $30,000 because she amended section 3.6(d) of the Outsource Agreement by hand prior to execution, changing the $50,000 amount specified as the line of credit to $30,000. Section 3.6(d) reads:

> OCAO will provide Doctor with a working capital line of credit of up to $50,000 (referred to as the "Line of Credit"), which will automatically be drawn down by OCAO to fund the payment of Authorized Payments as such payments become due and payable, to the extent that Doctor does not have sufficient funds in its OCAO Account to cover such payments. Doctor agrees to execute the Promissory Note to OCAO attached as Exhibit 8.6(d) providing for Doctor's repayment of the Line of Credit.

Goodman testified that she faxed a copy of the Outsource Agreement to Outsource reflecting the handwritten change and that she discussed this change with a representative of Outsource. Goodman argues that because she made this change in the Agreement, she should not be liable for more than $30,000 on the note. However, no change was made to the note itself, and Outsource satisfied the requirements to prove the note under Texas law, as stated above. Thus, Goodman's defense fails as to the $50,000 note. Goodman raises no defense as to the $5,000 note.

### B. The Outsource Agreement

Under the Outsource Agreement, Outsource paid Goodman's costs and expenses including her monthly rent, clinical supplies, and payroll. Outsource also paid Goodman a monthly draw of approximately $5,000 per month. Section 3.6(c) of the Outsource Agreement states:

> Notwithstanding anything to the contrary, if Doctor does not have sufficient funds in the OCAO Account to cover any Authorized Payment as such payment becomes due and payable, OCAO will notify Doctor. If funding is available from the Line of Credit described in Subsection 3.5(d) below, OCAO will draw down

5

>the Line of Credit in an amount sufficient to cover the payment, will credit such amount to Doctor's OCAO Account, and will so notify Doctor.  If funding is not available from the Line of Credit, Doctor shall have one business day from the date of OCAO's notice to make the necessary funds available to OCAO.  If Doctor fails to make the necessary funds available to OCAO within one business day of receiving notice from OCAO, OCAO will not be required to make the Authorized Payment and Doctor shall be deemed to be in material breach of this Agreement.  Alternatively, in OCAO's sole discretion, OCAO may elect to proceed with the Authorized Payment, in which event such payment shall be considered a loan to Doctor that shall bear interest at 12.5% per year, and shall be payable on demand by OCAO.

Thus, under the plain language of the Outsource Agreement, when Goodman's account balance fell short of her expenditures, Outsource was authorized to debit the line of credit to meet those expenses.  Outsource advanced $49,416.17 to Goodman under the line of credit note by the end of the first quarter of 2005.[8]  After the $50,000 line of credit was depleted, Outsource continued to pay Goodman's expenses, and under section 3.6(c) of the Outsource Agreement these payments were loans to Goodman, bearing interest at 12.5%.  These advances were used to pay the bills for Goodman's practice.

The line of credit promissory note was not amended and provides for line of credit loans of up to $50,000.  As stated above, Goodman's claimed change of the $50,000 limit in the Outsource Agreement to $30,000 is not a valid defense to the note itself, because the note was not amended.  Nevertheless, the court will address this argument of Goodman because it was really her main, if not sole, defense.  Even if the court accepts Goodman's assertion that the copy of the Outsource Agreement with the written changes was the copy executed by both of the parties,[9] it would make no difference in Goodman's liability under the Agreement.[10]  The last

---

[8] Exhibit 16; Trial transcript of October 23, 2007 at p. 30.
[9] The court is not convinced that this is the case because it was supported only by Goodman's testimony, which was not too clear as to when she made the change or that the

sentence of § 3.6(c) gives Outsource the right to advance additional funds to Goodman at its discretion. Goodman does not dispute that she signed the Agreement.

The amount of advances was shown on the monthly and quarterly statements issued by Outsource that were available on-line to Goodman at all times on Abbey Road, an Internet service made available by Outsource to Goodman.[11] Also, a hard copy of the account record showing the shortfall of revenues by Goodman's practice was mailed out for the first quarter statement of 2005.[12] Although Goodman testified that she did not look at the Abbey Road statements every day, she admitted that she looked at the statements every month, and that the statements always showed that her expenses were more than her revenues.[13] She also acknowledged that she was aware that Outsource was advancing on the line of credit note and that these moneys were "loans" to be repaid.[14] Although the line of credit advances were made up to the $50,000 limit of the note by March 2005, Outsource and Goodman continued to do business until August 2005. Outsource's representative testified that Outsource extended further loans under section 3.6 of the Outsource agreement.[15] Further, on July 11, 2005 Outsource and Goodman contracted for a separate loan in the amount of $5,000 to purchase an X-ray

---

agreement was signed by Outsource after the change.

[10] That is, Goodman would still owe Outsource the same total amount of money. The difference would lie in whether the money was loaned under the line of credit note or the agreement itself. Because the interest rate in the agreement is much higher that the interest rate on the note, Goodman is actually better off if the money is owed under the note.

[11] Exhibit 16; trial transcript of October 23, 2007 at pp. 20 & 34; trial transcript of October 24, 2007 at pp. 25 and 39.

[12] Trial transcript of October 23, 2007 at p. 34.

[13] Trial transcript of October 24, 2007 at p. 40.

[14] Trial transcript of October 24, 2007 at p. 43-44.

[15] Trial transcript of October 23, 2007 at p. 40.

processor.[16]  Goodman does not contend that the money was not advanced, nor does she contend that the money was not used to pay expenses related to her practice as required by the Outsource Agreement.

At trial, there was some confusion as to how much Goodman owed under the Outsource Agreement in addition to the amounts owed on the two promissory notes.  Cathy Green testified that Goodman owed a total of $77,200, which included all accrued interest.[17]  On direct, she did not provide information about what that figure consisted of in terms of breaking it down into its component parts.  On cross examination, Green testified at one point that it consisted of the $49,416 from the note, a $13,458.24 shortfall that included the $5,000 loaned for the X-ray processor, and some unknown portion of a $3,937.49 figure that was included on the financial statements under Fixed Asset Acquisition.  Green also testified that some portion of the doctor compensation category, which was the monthly draw of approximately $5,000 paid to Goodman, fell into the total, but she never stated exactly how much.[18]  Later in the cross examination, Green reiterated the amount of the notes, and the interest on the notes, the $13,458.24 shortfall amount and also explained that Goodman was owed a credit of $2,258.73 for insurance payments that had been received after she terminated her relationship with Outsource.[19]  The court could not reconcile the figures from Green's testimony and Exhibit 16, which contained Outsource's financial records for Goodman's practice with the $77,200 figure that Green had testified was the total amount owed by Goodman.  Therefore, the court finds that Outsource

---

[16] Exhibit 7; trial transcript of October 23, 2007 at p. 41.
[17] Trial transcript of October 23, 2007 at p. 42.
[18] Trial transcript of October 23, 2007 at pp. 53-57.
[19] Trial transcript of October 23, 2007 at pp. 68-70.

proved only that Goodman owed the amounts on the notes as stated above plus $6,199.51 under the Outsource agreement itself.[20] Because this amount was loaned under the Outsource Agreement, it will bear interest at the rate of 12.5% per year as provided for in the agreement.

### III.   Conclusion

The court finds that Goodman owes Outsource the following:

1) $49,416.17 on the line of credit note, plus accrued interest through October 23, 2007 in the amount of $7,285.13, plus interest at the rate of 8.5% provided in the note from October 24, 2007 until paid.

2) $5,000 on the X-ray note, plus accrued interest through October 23, 2007 in the amount of $511.40, plus interest at the rate of 8.5% provided in the note from October 24, 2007 until paid.

3) $6,199.51 for loans advanced under the Outsource Agreement plus interest at the rate of 12.5% provided for in the agreement from October 24, 2007 until paid.

All other claims of the parties are dismissed.

New Orleans, Louisiana, April 15, 2008.

*[signature: J. A. Brown]*
Jerry A. Brown
U.S. Bankruptcy Judge

---

[20] This consists of the $13,458.24 less the credit of $2,258.73 for the insurance received, less the $5,000 for the X-ray processor that the court has already awarded to Outsource.